UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                           Plaintiff,<br><br>v.<br><br>MICHAEL MCWHORTER,<br><br>                           Defendant. | Criminal Nos:<br>    18-CR-150-2 (DWF/HB)<br>    18-CR-313 (DWF)<br><br><br>**DEFENDANT MICHAEL<br>MCWHORTER'S POSITION<br>REGARDING SENTENCING** |

Defendant Michael McWhorter respectfully submits this sentencing memorandum through counsel, seeking a term of imprisonment not to exceed 120 months (10 years).

The government learned of its cases against Emily Claire Hari,[1] Joe Morris, and Michael McWhorter because of one person: Michael McWhorter. Mr. McWhorter cooperated with the government without counsel and without seeking a *quid pro quo*. And resulting from his cooperation, the evidence has shown that all of Mr. McWhorter's crimes were committed at the invitation, direction, and plan of the lead co-defendant in this case, Emily Claire Hari. Mr. McWhorter has repeatedly acknowledged his role in his offenses and has cooperated with law enforcement since his arrest. His cooperation has continued since then by helping the government prosecute its case against Ms. Hari, including

---

[1] Mr. McWhorter has always known Ms. Hari as "Michael Hari" or "Mike Hari." Out of respect for the Court's Order for Change of Name dated October 29, 2021 (Doc. No. 486), this memorandum uses Ms. Hari's new name. For ease of reference, all references to Document Numbers refer to those used in Case No. 18-CR-150 (DWF/HB), although some documents were simultaneously filed in 18-CR-313 (DWF).

pleading guilty more than three years ago. In recognition for his cooperation, a sentence that is a significant  downward departure and that disregards the mandatory minimums is not only warranted, but also supported by the government.

## BACKGROUND

### I.      Personal Background

Michael McWhorter was the third child born to his parents, William McWhorter and Louise Davis. Mr. McWhorter has eight older half-siblings, one of whom is deceased, and two stepsiblings. Mr. McWhorter remains in close contact with his mother and his sister Amanda.

Mr. McWhorter was raised in Clarence, Illinois, a rural, unincorporated township with a population of less than 100 in central Illinois. Mr. McWhorter's father had a long career as a truck driver, but he became disabled, which led to financial struggles for Mr. McWhorter's family. Jobs in and around Clarence—other than farming—were limited, especially after the town's grain elevator closed. Despite these struggles, Mr. McWhorter's mother maintained employment as a factory worker and at Walmart and is now retired.

Growing up, Mr. McWhorter's household included many relatives and often was shared with another family to assist with finances. Mr. McWhorter followed his family's tradition into adulthood, letting several relatives live with him, his wife, and his stepchildren. (*See* Tr.[2] at 537:22–538:4 (Mr. McWhorter's family lived with five relatives in summer of 2017); *see also id.* at 674:25–676:9 (Mr. McWhorter's testimony on cross-

---

[2]      "Tr." refers to the transcript dated November 12, 2020, containing Mr. McWhorter's testimony during Ms. Hari's trial.

examination describing who lived with him).) Corporal punishment was used in Mr. McWhorter's home, and he and his siblings were temporarily removed from his parents' home during the investigation of one of his half-sister's allegations of sexual abuse. Ultimately, the allegation was determined to be false, and Mr. McWhorter's family was reunited.

Mr. McWhorter was never in serious trouble growing up. Mr. McWhorter attended high school until mid-way through his tenth-grade year. He had been working full-time at various Hardees locations since 2006 to help support his family. He dropped out of school to be able to continue working. Due to learning disabilities, Mr. McWhorter was provided an individualized education plan ("IEP") starting in grade school. His IEP included accommodations such as having his tests read to him and having different teachers assigned to him compared to his classmates.

Mr. McWhorter's father passed away on February 7, 2007, barely a week before Mr. McWhorter turned 18.

After leaving school, Mr. McWhorter worked as warehouse specialist, where he was a forklift operator, order picker, and loading/receiving dock worker; at a slaughterhouse; and as a general laborer. Mr. McWhorter has a forklift operator certification and food service safety license.

Following a brief marriage that was later annulled, Mr. McWhorter had a daughter, Anna See, who is now 8 years old, and resides with her mother, Apryl Renfrew. Mr. McWhorter has been unable to contact Anna since an argument with Ms. Renfrew in 2017.

On July 1, 2017, Mr. McWhorter married Josephine ("Josie") McWhorter, and assumed both emotional and financial responsibility for four stepchildren due to his wife's past relationships. (Tr. at 535:24–536:5, 536:9–12.) Mr. McWhorter considers Mrs. McWhorter's children as his own. As a result of his involvement in this case, Mr. McWhorter testified that "[t]here's not really a marriage there now." (Tr. at 536:21–537:2.)

## II.     Mr. McWhorter's Association with Ms. Hari

Mr. McWhorter first met his Ms. Hari through his parents, when he was between eight and ten years old, and Ms. Hari was already an adult. (Tr. at 530:8–17.) In the summer of 2017, Mr. McWhorter was living in Rankin, Illinois. (Tr. at 535:21–22.) Following a period of unemployment and temporary jobs, Mr. McWhorter obtained a full-time job at a slaughterhouse through a temp agency in Rantoul, Illinois. (*See* Tr. at 537:6–13.) But he lost his job because his car had broken down and he had neither the money to get it fixed, nor another way to get to his job. (Tr. at 537:14–21.) Additionally, at his invitation, five other relatives moved in with Mr. McWhorter and his family because they had no place to go; they did not contribute to rent. (Tr. at 537:22–538:4.)

Ms. Hari heard of Mr. McWhorter's financial troubles through his mother and approached him about an opportunity to earn money, first by phone and later in person. (Tr. at 539:8–16, 540:1–4.) Ms. Hari proposed hiring Mr. McWhorter to do "security work" that used various types of equipment, planes, and helicopters. (Tr. at 541:18–542:8.) Desperate for work to provide for his immediate and extended family, Mr. McWhorter continued speaking to Ms. Hari. Ms. Hari said that they would have firearms and would use satchel charges to breach doors. (Tr. at 542:25–543:9.) At a subsequent meeting at a

public library, Ms. Hari showed Mr. McWhorter pictures of rioting in Ferguson, Missouri, and said that they would be on the "right-leaning side," that they would damage some "political" buildings and may have to defend themselves by "hit[ting] some of the left-leaning side." (Tr. at 544:1–545:11.) Mr. McWhorter believed he already had a job offer at this point, and the meeting at the library "was to basically decide if [he] wanted to do it or not." (Tr. at 547:25–548:4.)

Ms. Hari said that there was a risk that Mr. McWhorter would go to jail or possibly get killed, which Mr. McWhorter assumed was related to damaging buildings. (Tr. at 545:17–22.) Although those comments "gave [him] second thoughts," he was "willing to . . . go a step further than [he] normally would" because he "was desperate" because he was unemployed, and because a total of 11 people lived at his house, and no one was earning a paycheck. (Tr. at 545:23–546:13.) Ms. Hari told Mr. McWhorter he could earn up to $50,0000 as a "sign-on bonus" and earn $6,000 either per month or per week. (Tr. at 546:24–547:12.) Mr. McWhorter's desperate need for money propelled him to decide, either the day of that meeting or shortly after, that he was willing to "go a step further." (Tr. at 547:13–14, 547:16, 548:5–11.)

## A.    The Dar al-Farooq Center Bombing

At some point during the summer of 2017, Ms. Hari showed Mr. McWhorter at least two firearms, one of which was hers, and one of which she said would be issued to Mr. McWhorter. (Tr. at 553:25–554:4, 555:13–21.) Ms. Hari's firearm was altered to be fully automatic, but Mr. McWhorter's was not. (Tr. at 556:24–557:8.) Mr. McWhorter never fired either his own weapon or that of Ms. Hari in the commission of any of the charged

offenses. (Tr. at 556:21–23.) Ms. Hari also issued guns to Justin Butler and co-defendant Joe Morris. (Tr. at 559:10–21.) Ms. Hari purchased the weapons, decided who to issue particular guns to, and instructed Mr. McWhorter on how to modify weapons. (Tr. at 557:9–558:15, 558:22–559:9, 559:22–560:10.)

During the summer of 2017, Mr. McWhorter accompanied Ms. Hari to Delphi, Indiana because Ms. Hari had other business there and because Ms. Hari was looking for an "ammo shop." (Tr. at 560:11–561:3, 562:16–22, 563:14–20.) To make the trip, Ms. Hari rented a Nissan Frontier quad cab, and "always" rented vehicles for her business. (Tr. at 561:4–18.) At the ammo store, Ms. Hari purchased ten containers of black powder, which she paid for in cash. (Tr. at 567:25–568:11.)

About a week after the trip to Indiana, on August 4, 2017, Ms. Hari told Mr. McWhorter to be ready to be gone for four days to a month for a job but did not say where they were going. (Tr. at 5569:17–570:4, 570:14–20, 570:23–25.) Ms. Hari told Mr. McWhorter not to bring his phone because it could be tracked. (Tr. at 571:1–7.) Ms. Hari then picked Mr. McWhorter up around 4 p.m. or 5 p.m. in the same vehicle—the Nissan Frontier—that Ms. Hari drove to Indiana. (Tr. at 571:12–25.) Mr. McWhorter saw weapons in a bag in the back seat behind the driver's seat and he sat in the front passenger seat. (Tr. at 572:1–573:2, 573:14–17.) Near the weapons in the backseat, on the back floorboards, was a sledgehammer. (Tr. at 573:3–13.) The vehicle also contained a signal jammer that allowed the jamming of "anything electronic" for about 90 feet, and a scanner that allowed someone to listen to police bands. (Tr. at 573:18–575:7.)

6

Ms. Hari and Mr. McWhorter then picked up Mr. Morris from Roberts, Illinois, which was Mr. McWhorter's first time meeting Mr. Morris. (Tr. at 577:8–18.) Mr. Morris sat behind Mr. McWhorter in the back seat, next to the firearms. (Tr. at 578:2–6.) Ms. Hari told Mr. McWhorter and Mr. Morris only that they were going to work and to drop a package off. (Tr. at 581:3–7.)

Ms. Hari drove to Minnesota using a paper map and avoided toll roads in case they had cameras on them. (Tr. at 576:16–577:7.)  At some point, Ms. Hari also lowered the tailgate of the truck to block the vehicle's license plate. (Tr. at 580:8–20.) At one of the gas stations, Ms. Hari purchased diesel fuel and gasoline, mixed them together in a discarded windshield washer fluid container, and placed the container in the bed of the truck. (Tr. at 578:24–579:20, 579:25–580:7.) About an hour before arriving in Minnesota, Ms. Hari told Mr. McWhorter and Mr. Morris that there was a bomb in the truck, and they were going to bomb a mosque in Minnesota called Dar al-Farooq. (Tr. at 578:13–23, 582:12–15.) Specifically, Ms. Hari said that Mr. Morris would use the sledgehammer to break a window and throw the gas and diesel mixture in through the window, and Mr. McWhorter was supposed to light the bomb and throw it in the window afterwards. (Tr. at 581:11–20.) Ms. Hari would be the getaway driver. (Tr. at 581:21–22.) Ms. Hari said the bomb would go off before their prayers at 5 a.m. and the purpose of the bomb was to scare them. (Tr. at 582:23–583:7.) Ms. Hari provided gloves and masks to Mr. McWhorter and Mr. Morris so that there would be no DNA evidence and so that no one would see them. (Tr. at 583:17–584:2.)

The group arrived at the Dar al-Farooq Center around 4:30 or 5:00 a.m. on August 5, 2017. (Tr. at 584:3–6, 584:14–19.) Ms. Hari parked the truck facing north, between the office and what Mr. McWhorter would later learn was the Imam's office. (Tr. at 585:18–21, 586:5–7.) Mr. McWhorter saw some cars in the parking lot and lights on inside the building. (Tr. at 586:23–587:4.) Mr. McWhorter considered not going through with the plan, but he felt like he had to. (Tr. at 587:5–12.) Mr. McWhorter knew that Ms. Hari had previously "pulled a gun on someone for something that wasn't as serious as a mosque bombing." (Tr. at 726:5–18.) Thus, on August 5, 2017, Mr. McWhorter was concerned that because there were guns in the back of the truck, Ms. Hari would shoot him if he did not do what he was told. (Tr. at 587:11–15.)

Mr. McWhorter and Mr. Morris exited the vehicle. (Tr. at 587:18–19.) Mr. Morris was carrying the sledgehammer and the diesel and gas mixture, and Mr. McWhorter was carrying the bomb, which weighed about 15 pounds. (Tr. at 587:20–23, 588:8–11.) A window was  selected as the target because it was dark, and they did not want to hurt anyone. (Tr. at 589:24, 590:1–7.) At the time, Mr. McWhorter did not know that particular window was the Imam's office. (*Id.*) Mr. Morris broke the window with the sledgehammer and threw the bottle in. (Tr. at 590:12–15.) After a couple of attempts, Mr. McWhorter lit the fuse of the bomb. (Tr. at 591:1–24.) Mr. McWhorter threw the bomb into the window and went back to the truck as fast as he could because he did not know what would happen when went the bomb went off. (592:11–593:3.) Mr. McWhorter saw a person at the entrance of the building looking at him, which bothered him because he did not want to hurt anyone and there was not supposed to be any one at the mosque. (Tr. at 593:4–594:7.)

Once they were a few blocks away from the mosque, Mr. McWhorter heard through the police scanner that there was a possible explosion. (Tr. at 594:20–595:4.) Mr. McWhorter felt like he was in shock, and everything felt "really slow." (Tr. at 595:5–18.)

Mr. McWhorter testified that Ms. Hari later told him that she "didn't like Muslims" because she believed "their religion . . . takes over" Americans' religion. (Tr. at 583:8–15.) Ms. Hari told him Dar al Farooq was a terrorist training school. (Tr. at 596:7–10.)

Ms. Hari was the architect of the entire plan to bomb the mosque. She chose the target, made the bomb, decided to leave cell phones behind, chose the route to drive to and from Minnesota, made assignments to Mr. Morris and Mr. McWhorter for the actual bombing, and explained her reasoning. (Tr. at 596:22–598:2.) Mr. McWhorter felt he had to continue his association with Ms. Hari because it seemed like she did not do anything at the Dar al Farooq Center, other than sit in the truck. (Tr. at 664:17–25.)

B.    **The White Rabbits**

Ms. Hari came up with the group name the "White Rabbits" when she, Mr. McWhorter, and Mr. Morris returned from Minnesota. (Tr. at 614:21–24.) The group expanded to include several other people, including Mr. McWhorter's brother, Herbert McWhorter; and one of Mr. McWhorter's stepsons, Ellis ("EJ") Mack. (Tr. at 615:6–16.) The White Rabbits used an office as a meeting place.[3] (Tr. at 616: at 11–14.)

---

[3]    Mr. McWhorter maintains his objection to the PSR's statement that Ms. Hari "provided each new member of the [White Rabbits] group with a copy of *The White Rabbit Handbook*." (Doc. No. 420 at 4 ¶ 17.) Mr. McWhorter has no knowledge of the contents of this "handbook," has never read it, and was not provided a copy. (*See* Doc. No. 404 at 1.)

Mr. Mack talked with Mr. McWhorter before joining the White Rabbits. (Tr. at 615:22–24.) Mr. McWhorter discouraged him from joining because while he was involved, Mr. McWhorter had "already seen stuff that [he] didn't really like about it." (Tr. at 615:25–616:6.) Mr. McWhorter was already involved but did not want Mr. Mack to be involved, and also discussed with Mrs. McWhorter that he did not want Mr. Mack to be involved with the White Rabbits. (*Id.*) Ms. Hari then contacted Mr. Mack without Mr. McWhorter's knowledge or involvement and encouraged him to join the White Rabbits. When Mr. Mack came back and told Mr. McWhorter he had joined the White Rabbits anyway, Mr. McWhorter was upset. But Ms. Hari said, in front of both Mr. McWhorter and Mr. Mack, that Mr. Mack—who was 18 at the time—was "old enough to make his own decisions." (*See* Tr. at 615:20–21; *see also* Tr. at 616:7–10 (Mr. McWhorter's testimony that his reaction to Mr. Mack joining the White Rabbits was that he "couldn't really say anything" because Mr. Mack was 18).)

Mr. McWhorter feels terrible that his stepson, who he thinks of as his own son, became involved in the White Rabbits. As a result of Mr. McWhorter's and Mr. Mack's involvement with the group, Mr. Mack pleaded guilty to several federal charges in Illinois.

### C. Attempted Arson at Women's Health Practice in Champaign, Illinois

On November 7, 2017, Hari texted Mr. McWhorter, Mr. Morris and Wesley Johnson to meet up at the office of the White Rabbits in Clarence, Illinois. (Tr. at 638:11–639:2.)

Ms. Hari, Mr. McWhorter, Mr. Morris, and Mr. Johnson drove to Champaign, Illinois in a truck rented from Enterprise. (Tr. at 639:3–4, 639:7–16.) There were three AR-15s and one shotgun in the vehicle. (Tr. at 642:18–22.) On the way, Ms. Hari explained

10

that Mr. Morris was going to put a "firebomb" in the window of an abortion clinic, Women's Health Practice. (Tr. at 640:7–17.) When they arrived, Mr. Morris exited vehicle and returned two to three minutes later. (Tr. at 646:12–21, 647:12–13.) The group learned that the clinic did not actually burn down, but Ms. Hari said there was still a thermite charge, and because someone tried to damage the building, the clinic would understand that they were not liked. (Tr. at 647:14–648:3.) Mr. McWhorter sat in the car during this entire incident.

### D.   Home Invasion in Ambia, Indiana

On December 16, 2017, Ms. Hari, Mr. Morris, Mr. McWhorter, and one other person carried out a home invasion in Ambia, Indiana. The four participants carried firearms, "two of which had been illegally converted to machine guns," pretended to be police officers, and restrained some of the inhabitants. (Doc. No. 43 at 7–8.) Although this was intended to be a robbery, the participants did not obtain any money. (*Id.* at 8.)

### E.   Walmart Robberies in Illinois

On December 4, 2017, Ms. Hari, Mr. Morris, and Mr. McWhorter committed an armed robbery of a Walmart store in Watseka, Illinois, carrying replica firearms, where they obtained less than $1,500. (Doc. No. 43 at 8.) Ms. Hari "selected Walmart for the robbery because [s]he believed the corporation provided funding for anti-fascism ('Antifa') extremists." (Doc No. 420 at 6 ¶ 28.) Mr. Morris entered the store while Ms. Hari and Mr. McWhorter remained in the vehicle. (*Id.* at 7 ¶ 28.)

On December 17, 2017, Ms. Hari, Mr. Morris, Mr. McWhorter, and others attempted to rob a Walmart store in Mr. Vernon, Illinois. (Doc. No. 43 at 8.) Mr. Morris

and another individual entered the store, while Ms. Hari, Mr. McWhorter, and another individual remained in vehicles outside the store. No firearms were displayed and no money was obtained. (Doc. No. 420 at 7 ¶ 31.)

### F.    Sabotage of Canadian National Railway near Effingham, Illinois

On January 17, 2018, Ms. Hari, Mr. Morris, and Mr. McWhorter sabotaged part of a railroad track used by the Canadian National Railway, outside the town of Effingham, Illinois. (Doc. No. 43 at 8.) Ms. Hari then sent a communication to the Railway that it would suffer further sabotage unless the Railway paid an amount in cryptocurrency equivalent to a little more than $190,000. (*Id.*)

### G.    Jon O'Neill

Ms. Hari had some issues with an individual named Jon O'Neill. In February 2018, Ms. Hari, Mr. Morris, and Mr. McWhorter purchased acetone. (Tr. at 648:15–649:2.) Ms. Hari said she was going to use the acetone, along with propane tanks and peroxide to make fake bombs to plant in Mr. O'Neill's shed. (Tr. at 649:20–650:11.) Ms. Hari manufactured the fake bombs and instructed Mr. McWhorter to remove the labels from jars and pour a liquid into small brown bottles. (Tr. at 650:21–651:18.) Ms. Hari and Mr. Morris went to Mr. O'Neill's house with the fake bombs, but Mr. McWhorter did not. (Tr. at 651:19–22.)

Ms. Hari said he was going to send a tip about the bombs at Mr. O'Neill's home to attempt to get him intro trouble. (*See* Tr. at 651:23–652:1.)

### H.    Hiding

In March 2018, Mr. McWhorter learned from Ms. Hari that law enforcement was asking his brother Herbert questions. (Tr. at 661:7–21.) Ms. Hari, Mr. Morris, and Mr.

Mack went "off the radar" by hiding in the countryside. (Tr. at 661:7–662:13.) Mr. McWhorter testified that he was scared and did not to know what to do. (Tr. at 664:1–12.) He knew he had done "a lot of bad stuff" and "was afraid to go to jail." (Tr. at 664:10–12.) He felt obligated to stay with the group because he thought Ms. Hari would get off "scot-free" because the only thing she did in Minnesota was sit in the truck. (Tr. at 664:17–25.)

After hiding in the countryside for a few days, the group ended up at the home of Robert Wankel, who was a friend of Ms. Hari's. (Tr. at 665:4–9.) While they were at Mr. Wankel's, the group made a video. (Tr. at 667:5–7.) In the video, Mr. McWhorter said what Ms. Hari told him to say. (Tr. at 669:17–23.)

After a few days, Ms. Hari decided that the group should return to Clarence to find out what the FBI knew about them. (Tr. at 670:18–671:4.)

## I.      Payments to McWhorter

In addition to the above activities, Mr. McWhorter did odd jobs for Ms. Hari like fixing things at the office and changing the alternator on Ms. Hari's truck. (Tr. at 548:20–549:3.) Ms. Hari's payments of a sign-on bonus and monthly or weekly payments, however, did not materialize. (*Cf.* Tr. at 546:24–547:12.) Instead, Ms. Hari paid for Mr. McWhorter's rent ($500 per month) and helped remodel Mr. McWhorter's bathroom by helping with the labor and by purchasing supplies. (Tr. at 549:4–12, 684:9–685:7.) The payment for rent and assistance with the bathroom were the only payments Mr. McWhorter ever received from Ms. Hari—all less than $2,500.

### III.    Arrest and Guilty Plea

The day after Mr. McWhorter returned to Clarence, he was interviewed by Agent Smith of the FBI. (Tr. at 671:11–13.) He was eager to talk because he was scared and wanted help. (Tr. at 671:14–18.) Mr. McWhorter did not ask for a lawyer, but he did ask for immunity. When he was told the prosecutor said "no" to immunity, he continued cooperating anyway and did not ask for a lawyer or for any other type of "deal."

Mr. McWhorter began by withholding some information to protect his family. (Tr. at 672:6–8.) But over the course of several hours, Mr. McWhorter answered all of Agent Smith's questions and has continued to cooperate with law enforcement, beginning a pattern of cooperation that he has maintained to date. (Tr. at 672:4–5, 672:9–13.) Prior to Mr. McWhorter's cooperation, the government had no information regarding who committed the crimes in Bloomington, Minnesota or Champaign, Illinois. Michael McWhorter—without counsel or personal benefit—provided the government with the facts relating to those crimes and identities of the individual involved.

Mr. McWhorter was arrested and detained on March 13, 2018. Since then, he has agreed to participate and cooperate in countless meetings with law enforcement in both Illinois and Minnesota.

On January 24, 2019, Mr. McWhorter pleaded guilty before this Court to the following charges from the superseding indictment filed in the United States District Court for the Central District of Illinois on May 2, 2018 (the "Illinois Indictment"): Count 1: Possession of a machine gun in violation of 18 U.S.C. §§ 922(o), 924(a)(2); Count 2: Conspiracy to Interfere with Commerce by Threats and Violence, in violation of 18 U.S.C.

§§ 2, 1951; and Count 3, Attempted Arson, in violation of 18 U.S.C. §§ 2, 844(i). (Doc.

No. 43 at 1–2.) Mr. McWhorter also pleaded guilty to the following charges filed on June

20, 2018 in the United States District Court for the District of Minnesota (the "Minnesota

Indictment"): Count 2, Intentionally Obstructing and Attempting to Obstruct by Force and

the Threat of Force, and by means of fire and explosives, the Free Exercise of Religious

Beliefs, in violation of 18 U.S.C. §§ 2, 247(a)(2); and Count 4: Carrying and Using a

Destructive Device During and in Relation to a Crime of Violence, in violation of 18 U.S.C.

§§ 2, 924(c)(1)(B). (*Id.* at 1–3.)

## IV.   Mr. McWhorter's Continued Cooperation

Consistent with his behavior prior to entering the Plea Agreement, Mr. McWhorter

continued to willingly cooperate with law enforcement and the U.S. Attorney's office

following his plea hearing. Ms. Hari's trial in this matter was held in November 2020. Mr.

McWhorter testified during Ms. Hari's trial for much of the day on November 12, 2020.

(Tr. at 526:7–726:25.) It is Mr. McWhorter's understanding that the government

considered Mr. McWhorter's testimony helpful and impactful in convicting Ms. Hari.

Mr. McWhorter also intended to testify in Ms. Hari's case in the Central District of

Illinois. However, because Ms. Hari pleaded guilty in that matter, Mr. McWhorter's

testimony was not necessary. (*See* Wickham Decl. Ex. A.)

The government acknowledges that Mr. McWhorter has "cooperated with law

enforcement concerning ongoing investigations," meaning he has been "debriefed by law

enforcement officers, assist[ed] proactively in ongoing law enforcement investigations,

and testif[ied] truthfully" at Ms. Hari's trial. (Wickham Decl. Ex. B.) In exchange, the

government agreed to move the Court, pursuant to 18 U.S.C. § 3553(e), "to allow the Court to sentence [Mr. McWhorter] without regarding to any mandatory minimum sentence of imprisonment" that applies. (*Id.*) The government also agreed to move the Court, pursuant to U.S.S.G. § 5K1.1, for a downward departure from the Guidelines range. (*Id.*)

## SENTENCING ANALYSIS

### I.   Legal Standards

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

The Court is required to impose a sentence that is "sufficient, but not greater than necessary, to comply with" the following purposes:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). The Supreme Court counsels district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range" and allowing the parties to advocate for the sentence they deem appropriate. *Gall v. United States*, 552 U.S. 38, 49 (2007).

The district court should then consider the factors in § 3553(a), *id.* at 50, including "'the nature and circumstances of the offense and the history and characteristics of the defendant,' as well as 'the need for the sentence imposed' to serve the four overarching aims of sentencing." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017) (quoting §§ 3553(a)(1), (2)(A)–(D)). In addition, the district court must consider the kinds of sentences available and the sentencing range, pertinent policy statements, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and restitution. § 3553(a)(3)–(7).

The district court "may not presume that the Guidelines range is reasonable," and "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. When a district court departs from the Guidelines, the court must "ensure that the justification is sufficiently compelling to support the degree of variance." *Id.*

## II.      Guidelines Sentence and Departures

A Guidelines sentencing range is calculated in a table using the adjusted offense level and the defendant's criminal history category. U.S.S.G. § 5, appl. n.1. Mr. McWhorter agrees with the adjusted offense levels described in the Presentence Investigation Report ("PSR") (Doc. No. 420 at 15–21), which are consistent with the Plea Agreement (Doc. No. 43 at 13–16), and yield a total adjusted offense level, after acceptance of responsibility, of 28. The Probation Office calculated Mr. McWhorter's criminal history category to be II because Mr. McWhorter "committed the instant offense while on probation." (Doc. No. 420 at 21–22 (citing U.S.S.G. § 4A.1(d)); *see also id.* at 29 ¶ 170.) An offense level of 28

and criminal history category of II yields a Guidelines range of 87–108 months. U.S.S.G. § 5A.

Consistent with the Plea Agreement and the PSR, Count 3 of the Illinois Indictment (attempted arson) carries a mandatory minimum of 5 years (60 months), and Count 4 of the Minnesota indictment (carrying and using a destructive device during and in relation to crimes of violence) carries a mandatory minimum of 30 years (360 months) that may not be concurrent with any other term of imprisonment. (Doc. No. 43 at 16; Doc. No. 420 at 29 ¶ 167); *see also* 18 U.S.C. §§ 844(i), 924(c)(1)(B)(ii), 924(c)(1)(D)(ii).

### A.    The Court may sentence Mr. McWhorter without regard to the applicable mandatory minimums.

As stated above, two counts to which Mr. McWhorter pleaded guilty carry mandatory minimums: Count 3 of the Illinois Indictment and Count 4 of the Minnesota Indictment. Because of Mr. McWhorter's extensive cooperation in this case, Mr. McWhorter expects the government to move this Court to allow Mr. McWhorter to be sentenced without regard to mandatory minimums. (Wickham Decl. Ex. B.) This anticipated motion allows the Court "the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." 18 U.S.C. § 3553(e).

Because the government has committed to making a motion pursuant to § 3553(e), the Court may issue a sentence that is below the mandatory minimums associated with Count 3 of the Illinois Indictment and Count 4 of the Minnesota Indictment.

**B.      A downward departure from the Guidelines range is warranted.**

**1.      Downward Departure Based on Cooperation**

Because of Mr. McWhorter's extensive cooperation in this case, Mr. McWhorter also expects the government to move this Court for a downward departure pursuant to U.S.S.G. § 5K1.1. (Wickham Decl. Ex. B.) This section allows the Court to depart from the Guidelines "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." The Court may consider the following factors:

(1)      the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2)      the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3)      the nature and extent of the defendant's assistance;

(4)      any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and

(5)      the timeliness of the defendant's assistance.

§ 5K1.1(a).

Although the government has not, as of the submission of this memorandum, filed its motion, Mr. McWhorter has satisfied the policy statements in § 5K1.1. *First*, the government appears to consider Mr. McWhorter's assistance valuable, truthful, complete, and reliable, relying on his testimony during their case-in-chief at trial and citing it in support of their position for Ms. Hari's sentencing. (Doc. 462 at 6 n.5, 16.) Even Ms. Hari relied on Mr. McWhorter's testimony in her sentencing memorandum. (Doc. No. 464 at 3–4, 12.) *And second*, Mr. McWhorter's cooperation was both extensive and timely. Mr.

McWhorter began cooperating with law enforcement almost immediately after his arrest and before obtaining counsel, and continued cooperating through the preparation for and testimony during Ms. Hari's trial. Additionally, Mr. McWhorter was prepared to continue cooperating by testifying at Ms. Hari's trial in Illinois, which was ultimately canceled when Ms. Hari pleaded guilty. (*See* Wickham Decl. Ex. A.)

For the foregoing reasons, as well as any additional reasons in the government's anticipated motion, a downward departure is appropriate.

### 2.    Downward Departure Based on Criminal History Category

A downward departure is also warranted based on Mr. McWhorter's overstated criminal history score.

#### a.    *The government does not object to a lower criminal history score.*

Although the Probation Office determined Mr. McWhorter's criminal history score was II, in the Plea Agreement, the parties assumed that Mr. McWhorter's criminal history category was I. (Doc. No. 43 at 16.) In its objections to the PSR, the government stated:

> Given the acknowledgment in paragraph 7 of the Plea Agreement and Sentencing Stipulations that the final criminal history as calculated by the Court may differ from that estimated by the parties, the government will adhere to the agreement it made and hold that the sentence in the Plea Agreement and Sentencing Stipulations should be followed by the Court, given that sentence calculation is at least part of the reason the defendant entered into the Plea Agreement and Sentencing Stipulations.

(Doc. No. 401 at 5.) Thus, the government does not object to Mr. McWhorter's criminal history score being lowered to I, which, setting aside the mandatory minimums, would decrease the Guidelines range from 87–108 months to 78–97 months for an offense level of 28. *See* U.S.S.G. § 5A.

>   **b.**     ***A downward departure is warranted based on Mr. McWhorter's overstated criminal history score.***

A downward departure is independently warranted because Mr. McWhorter's "criminal history category substantially over-represents the seriousness of [his] criminal history" and "the likelihood that [he] will commit other crimes." U.S.S.G. § 4A1.3(b)(1).[4]

Mr. McWhorter's criminal history score is based three points, all of which arise from a single 2016 conviction on three misdemeanor counts of manufacturing/delivering cannabis, to which Mr. McWhorter pleaded guilty. (Doc. No. 420 at 22 ¶ 129.) The circumstances described in the PSR demonstrate that Mr. McWhorter sold marijuana to a confidential source in two separate controlled purchases. (*See id.*) The conviction itself resulted in one point. The remaining two points were added because Mr. McWhorter committed the offenses that are the subject of this case while on probation for those misdemeanors. (*Id.* at 22 ¶¶ 131–32); *see also* U.S.S.G. § 4A1.1(d).

These three points overstate Mr. McWhorter's criminal history because his conviction has a narrow scope of harm: he sold marijuana to a confidential source for law enforcement in a "controlled purchase," a transaction designed from beginning to end to harm only Mr. McWhorter. *See, e.g.*, *United States v. Hughes*, 825 F. Supp. 866, 869 (D. Minn. 1993) (stating that "defendant's actual criminal history is significantly less serious than that of most criminal defendants in category II and that category II significantly over-represents the seriousness of his criminal history and the likelihood that he will commit

---

[4]     The prohibitions and limitations to this downward departure do not apply to Mr. McWhorter. *See* U.S.S.G. § 4A1.3(b)(2)–(3).

further crimes" because the defendant's criminal history score was based on two separate convictions of one point each). Further, neither the sale nor possession of cannabis are related in any way to the crimes to which Mr. McWhorter pleaded guilty in these matters, nor are they related to the underlying factual bases of those crimes. The sale and/or use of cannabis is simply not an issue in neither the Illinois nor Minnesota Indictments.

## III.   The Remaining § 3553(a) Factors

### A.   Nature and Circumstances of the Offense and History and Characteristics of the Defendant

#### 1.   *Nature and Circumstances of the Offenses*

Each of Mr. McWhorter's convictions as described in the Plea Agreement, PSR, and Mr. McWhorter's testimony are a direct result of the plan, coordination, and instruction of Ms. Hari. Ms. Hari came up with the plan for all incidents to which Mr. McWhorter pleaded guilty, provided instructions and equipment, and ensured that the plans were carried out. Ms. Hari has now been convicted of charges arising out of the same incidents as Mr. McWhorter.

The parties agree that Ms. Hari was the orchestrator of the Dar al Farooq bombing, and the jury agreed. (Doc. Nos. 324 (Redacted Verdict); 487 (Judgment).) Mr. McWhorter also testified that Ms. Hari orchestrated the attempted arson at the Women's Health Practice, for which Ms. Hari has now pleaded guilty in Illinois. (Wickham Decl. Ex. A at 18–19.) Ms. Hari also pleaded guilty to charges related to the Ambia, Indiana home invasion, robbery at a Walmart in Watseka, Illinois; attempted robbery at a Walmart in Mt.

Vernon, Illinois; sabotage of railroad tracks owned by the Canadian National Railway;[5] and attempt to get Mr. O'Neill in trouble with law enforcement—all of which form the factual bases for Mr. McWhorter's plea. (*Compare id.* at 19–21, *with* Doc. No. 43 at 6–9.)

Ms. Hari provided Mr. McWhorter with a weapon, and prior to that, Mr. McWhorter had very limited knowledge of guns. (Tr. at 556:16–20.) It was never part of the plan to hurt anyone, especially at the Dar al-Farooq Center. (Tr. at 590:1–7.)

### 2. *Mr. McWhorter's History and Characteristics*

As described above, Mr. McWhorter lived a largely law-abiding life until his association with Ms. Hari in late 2017. His actions with Ms. Hari were driven by believing Ms. Hari's lies that Dar al-Farooq was a terrorist training camp, and other misinformed beliefs about Muslims and the Islamic religion. (*See* Tr. at 596:7–10.) In addition, Ms. Hari approached Mr. McWhorter at a time when he was financially vulnerable, without a job or reliable transportation to support not only his own family, but other relatives who were staying with him. Mr. McWhorter almost immediately recognized his mistake in trusting Ms. Hari and began to cooperate with law enforcement following his arrest and before obtaining counsel.

Since Mr. McWhorter's arrest and detention, he has worked hard to better himself. He has spent more than 537 hours in education at Sherburne County Jail, completing 164 courses. (Wickham Decl. Ex. C.) He has also completed the Sherburne County Jail

---

[5]     Mr. McWhorter maintains his objection to the PSR's statement that "the defendants ignited thermite to sabotage a portion of railroad track." (Doc. No. 420 at 7 ¶ 31.) Only Ms. Hari ignited the thermite. (Doc. No. 404 at 2.)

Substance Abuse Education Program. (Wickham Decl. Ex. E.) He has read several books provided to him by counsel, and interestingly, he has developed friendships with several individuals who espouse the Muslim faith.

In September 2021, Mr. McWhorter wrote a letter of apology to Imam Mohamed Omar of the Dar al-Farooq mosque. (Wickham Decl. Ex. D.) Mr. McWhorter apologized for his actions and acknowledged that he knows better. He has been detained with Muslim detainees with whom he has developed friendships. At his request to learn more about the Muslim faith, Mr. McWhorter's counsel sent him the book *Islam Explained: A Short Introduction to History, Teachings, and Culture*, by Ahmad Rashid Salim. (*Id.* at 5.) Mr. McWhorter has read this book, shared it with fellow inmates, and has taken great pride in learning more about the Muslim faith. He has explained to counsel how much Muslim and Christian faiths have in common.

In the coming weeks prior to sentencing, Mr. McWhorter expects to submit to the Court letters of support from his friends and family. Mr. McWhorter anticipates that these letters will address the fact that he is a good person who made bad decisions under the influence of Ms. Hari.

**B.    Seriousness of Offense, Respect for the Law, Just Punishment, Deterrence, and Public Protection from Further Crimes**

Mr. McWhorter understands the seriousness of his offenses and wishes he had never been led astray by Ms. Hari. Mr. McWhorter has no interest in any further association with the White Rabbits or any other group that promotes or uses violence. Mr. McWhorter intends to use his time in prison to better himself. He hopes to continue with the coursework

described above and obtain a GED. When he is released, he would like to work as a mechanic and eventually start his own business where he can be his own boss. He told counsel that "a business is only as strong as its weakest employee."

Sentencing Mr. McWhorter to ten years of prison reflects that his crimes were serious and deters others from making similarly poor choices. At the same time, this term of imprisonment's downward departures reflects Mr. McWhorter's role as a desperate co-conspirator, not an organizer.

The true organizer of Mr. McWhorter's crimes has been sentenced to 636 months (53 years), reflecting that Ms. Hari's role was much more significant than Mr. McWhorter's.

### C.    Time Served

Mr. McWhorter requests that he be credited for time served and that the conditions of his pre-trial detention be considered, which is often referred to as "hard time." *See United States v. Fortier*, No. 17-CR-96 (PJS/DTS), 2022 WL 119052 (D. Minn. Jan. 12, 2022) (noting "there is no departure or other formal type of credit for 'hard time'" but that defense counsel frequently ask for a downward variance "on the basis that their clients' pretrial custody was particularly long or onerous"; "Such requests have become common in the last two years, given the delays caused by the pandemic, and given the harsh measures that detention facilities have taken to slow the spread of COVID-19.").

Mr. McWhorter was arrested on March 13, 2018 and has been detained ever since, a period of more than four years. (*See* Doc. No. 420 at F.2.) Although serving time in a

county jail while awaiting trial or sentencing is extremely common, Mr. McWhorter's experience is uncommon.

*First*, Mr. McWhorter has been detained at Sherburne County Jail since approximately December 10, 2018. Thus, at the time of sentencing, he will have been in a Minnesota county jail for more than 40 months, nearly three and a half years, the majority of which was *after* he pleaded guilty in January 2019. Mr. McWhorter has patiently waited for his sentencing date while Ms. Hari's trial was delayed numerous times, and even after trial, her sentencing did not take place until nine months after the conclusion of trial, which in turn delayed the Illinois trial and ultimate plea in that case. Thus, Mr. McWhorter's time at Sherburne has been uncommonly long compared other pretrial detainees.

Mr. McWhorter has had access to some limited programming available to pre-trial detainees, such as taking classes to prepare him for the GED, substance abuse programming, and other educational programs. The programming, however, is limited compared to what may be available to him in the Bureau of Prisons. In particular, Mr. McWhorter is interested in obtaining his GED, additional substance abuse education, and vocational training.

*Second*, the conditions at Sherburne have further restricted inmates as the result of the onset of the COVID-19 global pandemic in March 2020. Laundry was delayed and inmates were not always allowed to shower daily. Although some of those conditions have improved, inmates' movements and access to programming are still curtailed to limit the spread of the COVID-19, including the prohibition of non-employees such as educational instructors from entering Sherburne to provide services. Even in the last few months,

Sherburne County Jail has limited inmates' ability to receive books, even when shipped directly from a vendor like Amazon.com.

### D.    Location of Imprisonment

Since Mr. McWhorter's detention in Minnesota, Mr. McWhorter's mother and sister have been unable to visit him given the distance from their home. Mr. McWhorter's mother lives in Clarence, Illinois, and his sister lives in Fisher, Illinois, a town about 40 minutes away from Clarence. Mr. McWhorter respectfully request that he be assigned to the Federal Correctional Institutions in Pekin, Illinois; Greenville, Illinois; or Terra Haute, Indiana—all of which are between an hour and half to two hours and a half away from Clarence and would allow for better opportunities for family visits.

### CONCLUSION

For the foregoing reasons, Mr. McWhorter respectfully asks the Court to consider a 120-month sentence as sufficient under the 18 U.S.C. § 3553(a) factors and in light of his substantial assistance to the government since his arrest.

**MADEL PA**

Dated: March 24, 2022          By:    _s/ Christopher W. Madel_
                                      Christopher W. Madel (#230297)
                                      Ellen Ahrens Wickham (#391004)
                                      800 Hennepin Avenue
                                      800 Pence Building
                                      Minneapolis, MN 55403
                                      Phone: (612) 605-0630
                                      Fax: (612) 326-9990
                                      cmadel@madellaw.com
                                      ewickham@madellaw.com

                                      ***Attorneys for Defendant Michael McWhorter***